Donald Eugene HARDING, Petitioner,

v.

Samuel A. LEWIS, et al., Respondents.

No. CIV 85–744 TUC ACM.

United States District Court,
D. Arizona.

April 30, 1986.

Francisco Leon, Tucson, Ariz., for petitioner.

Jack Roberts, Asst. Atty. Gen., Dept. of Law, Phoenix, Ariz., for respondents.

## ORDER

MARQUEZ, District Judge.

Petitioner, Donald Eugene Harding, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.A. § 2254. Petitioner is presently in state custody on death row at the Arizona State Prison Complex. The Petition raises six grounds for habeas relief which will be considered in the order they appear therein. The grounds alleged are; 1) ineffective assistance of counsel, 2) failure to make a knowing waiver of counsel, 3) lack of a competency hearing prior to waiver of counsel, 4) admission of prejudicial photographs, 5) failure to recuse the prosecutor and, 6) failure to suppress statements.

### I.

### FACTS

The direct evidence presented at trial against Mr. Harding was overwhelming. No defense was presented. The evidence heard by the jury is summarized below as taken directly from the trial transcripts. The court has marked the transcripts with standard exhibit numbers 1–36.

On January 26, 1980, the Tucson Police Department was called to investigate suspicious circumstances at the La Quinta Motel in Tucson, Arizona. The Officers involved discovered two bodies, one located next to the bed and the other in the bathroom. (Exhibit (Ex) 28. pages 43–46). The bodies were identified as Martin L. Concannon and Robert A. Wise. (Ex. 28 page 95) The jury was shown approximately 150 pictures

depicting the room where the crime occurred and the autopsies performed on the victims. The pictures demonstrated that the victims were bound repeatedly with various types of ligatures. The body of Martin L. Concannon was found on the floor of the bathroom covered with a bedspread. His body had been repeatedly bound, two men's socks stuffed into his mouth and a pillow placed under his head. (Ex. 29 page 62–90). Robert Wise's head was tethered to the bed and he was hogtied with his feet bound together and tied with a sheet to his elbows. A belt had been wrapped around his wrists which constricted his hands. Blood splattered on the walls indicated that Wise was beaten repeatedly. (Ex. 29 pages 116–129). Pieces of teeth were found underneath his head. (Ex. 28 page 136). Small chips of synthetic wood were found under the body (Ex. 28 page 161) which were identified as pieces from the base of the hotel room lamp. (Ex. 30 page 126). Chemical analysis showed human blood on the base of this lamp. (Ex. 30 page 146). The harp of the lamp was found near Wise's body. (Ex. 28 page 119). The lamp itself had been plugged back into the wall. (Ex. 28 page 164).

Identifiable prints were taken from; the do-not-disturb sign found outside the door, a small glass on the table near the bed, cellophane wrapping from a package of Winston cigarettes and off the top part of the lampshade. All four of these fingerprints were identified as matching those of Donald Harding. (Ex. 29 page 23). Fingerprints were also removed from the telephone receiver, a light bulb and an ashtray. These prints were also identified as matching those of Donald Harding. (Ex. 29 pages 46–52).

The pathologist testified that Robert Wise was shot in the chest from front to back and in the left temple. The wounds revealed that he was shot with the muzzle of the gun only a few inches from the skin. (Ex. 29 page 113–120; Ex. 30 page 114). He sustained a multiple fracture to the jaw and his teeth had been broken by repeated impacts with a blunt object. A tether had been placed around Wise's neck with

enough force to create a U-shaped abrasion, which penetrated the skin, causing the blood vessels to rupture. The victims wrists had been tightly bound. Wise's death was caused by the bullet wound to the chest which perforated the spinal cord. The time of death was estimated by the pathologist at between 1 p.m. and 7 p.m. on January 25, 1980 (Ex. 29 pages 141–142).

The autopsy performed on Martin Concannon showed that his death was also caused by a shot to the chest which perforated the spinal cord. He had also been shot in the temple. The autopsy revealed that the two socks which had been pushed to the back of his throat had covered all breathing passages. Hemorrhaging in the scalp tissue, caused by lack of oxygen, indicated that Concannon had not died immediately. (Ex. 29 pages 143–144) (Ex. 30 pages 11–17).

Jeri Wise testified that her husband was the district manager for KAR Products. She testified that he left the 24th of January to see Marty Concannon, one of his salesmen, and to make a call in Ft. Huachuca. Mrs. Wise expected him to return the next day, January 25, around 6:30 p.m. At approximately 8:40 on that night a man came to the Wise's home and asked if Bob was there. Mrs. Wise testified that the man was holding one of her husband's business cards and acting very nervous. She stated that he was wearing a rust colored jacket and a burgundy shirt. The man left the Wise's home when she told him she expected her husband home soon as he was already overdue. Mrs. Wise positively identified Donald Harding as the man at her door that night. (Ex. 30 page 151–166).

January 26, 1980 a Northern Arizona University police guard was assigned to a parking lot near the athletic dome on the NAU campus to ensure that only members of the booster club parked in the lot. He observed a man driving an Oldsmobile, with Ohio plates, pull into the lot. The guard told the driver that he would not be allowed to park in the lot. The driver asked if there was a place he could park

and the guard suggested a lot north of the dome. The guard identified the driver of the car as Donald Harding. (Ex. 30 pages 22–26). The Oldsmobile he was driving belonged to Martin Concannon. (Ex. 18 page 506).

The guard testified that Harding appeared a little strange because he spoke with a Southern accent but was driving a car with Ohio plates. He testified Harding was also wearing two jackets and had numerous articles in the back seat. The guard ran a warrants check on the car and was told that it had been stolen from Tucson. He called for back up units and they arrested Harding. A body search revealed a .25 automatic in Harding's jacket pocket. (Ex 30 pages 25–41). A ballistics check run on the gun showed that it was the same weapon used to kill Concannon and Wise in Tucson. (Ex. 30 pages 116–122). Two security badges, a wallet and an identification card issued to Ronald Svetgoff were also found on Harding. Harding told the NAU police that he was Svetgoff but looked different because he had lost some weight and changed his hair. (Ex. 30 pages 37–38).

Robert Svetgoff testified that he was robbed in a motel in Waco, Texas on December 18, 1979 by a man he identified as Donald Harding. He said that Harding approached him, showed him a security badge, identified himself as a security officer and demanded that Svetgoff produce identification. Svetgoff identified one of the badges found on Harding as the one used during this robbery. When Svetgoff opened the door to his hotel room, Harding pulled a gun, forced Svetgoff onto the floor and tied him up with a tie, a torn dress shirt and his jumprope. (Ex. 28 page 33). Harding put a sock in Svetgoff's mouth, wrapped a t-shirt around that and then tied a belt around his mouth. Harding then rolled Svetgoff in a bedspread, dragged him into the bathroom and placed a pillow under his head. Harding stole all of Svetgoff's clothes and left in his car. (Ex. 28 page 28–41).

The Tucson police executed a search warrant on the car that Harding was driving when he was arrested. In it were found; 1) a tan attache case (which Mrs. Wise identified at trial as her husband's), 2) loose credit cards in the name of Robert Wise and 3) a box of pens and a memo pad with KAR logo. (Ex. 28 pages 69, 81, 162).

The Tucson police obtained clothing from the Coconino County Jail which included a burgundy colored long-sleeved shirt, a pair of black shoes and two jackets. Jeri Wise identified the burgundy shirt as the one Harding was wearing when he came to her house. (Ex. 30 page 162) Chemical tests performed on this shirt showed the presence of human blood. (Ex. 30 page 144). Inside one of the jackets was Robert Wise's drivers license and page C–D torn out of an address book with the names of Pam and Martin Concannon circled. (Ex. 30 page 67).

Two statements made by Harding were introduced into evidence at the trial. The first was made while Harding was being transported from Flagstaff to Tucson. A Tucson police detective testified that it was a cold day and Harding was wearing only a short-sleeved shirt. The detective opened his suitcoat to protect him from the wind while they waited for the airplane. The detective testified that Harding looked at him and said "you don't need to do that, I deserve whatever I get." (Ex. 30 pages 85–87)

Harding made a second statement in Tucson. The same detective testified that Harding asked if he could get some of his clothes returned and that the detective told him that the police had to keep the clothes in order to look for evidence. Harding told the detective that he might find something on the burgundy shirt and shoes but the rest of the clothing had not been worn. (Ex. 30 pages 90).

## II.

### PROCEDURAL HISTORY

*April 27, 1982:* Donald Harding was convicted, by a Pima County Superior Court

jury, of two counts of armed robbery, two counts of kidnapping, theft of property valued at over $1,000 and two counts of murder in the first degree.

*May 26, 1982:* An aggravation hearing was held in front of the trial court. The court found four aggravating and no mitigating circumstances. No mitigating evidence was presented. The court sentenced Mr. Harding to two consecutive 21 year terms for robbery, two consecutive 21 year terms for kidnapping, a consecutive five year term for theft and for each murder charge a sentence of death was imposed. (Ex. 31 page 139–177).

*September 6, 1983:* The Arizona Supreme Court affirmed the convictions and sentences on appeal. *State v. Harding,* 137 Ariz. 278, 670 P.2d 383 (1983). The Court denied a Petition for Rehearing.

*January 10, 1984:* A Petition for Certiorari was denied by the United States Supreme Court.

*March 20, 1984:* Harding filed for Post Conviction Relief pursuant to Rule 32 of Ariz.R.Cr.P. His requested stay of execution was granted March 23, 1984 by the trial court pending the outcome of the Rule 32 hearing. The trial court granted an evidentiary hearing on the sole issue of whether Harding was denied a fair trial or effective assistance of counsel due to the inadequacy of the advice and representation given by counsel. Evidentiary hearings on this issue were held on August 7 and October 30, 1984.

*December 28, 1984:* The trial court issued Findings of Facts and Conclusions of Law, denying post-conviction relief. A petition for reconsideration was denied. The Supreme Court denied review.

*June 12, 1985:* The Arizona Supreme Court issued a warrant of execution which was stayed by the Federal District Court on August 2, 1985.

October 16, 1985 Harding filed this Amended Petition for Writ of Habeas Corpus. 28 U.S.C. § 2254.

## III.

## ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Harding claims he was denied due process of law and the effective assistance of counsel by the quality and nature of the advice given to him by Attorney Cooper.

Harding alleges that his attorney, Public Defender Dan Cooper, advised him that he should defend himself in order to inject fundamental error into the proceedings which would result in reversal on appeal. Harding states that Cooper's advice resulted from the friendship they had developed and from Cooper's opposition to the death penalty. Harding contends that he was simply following the advice of his attorney when he sought his right to represent himself.

Cooper filed a motion to withdraw as counsel which was denied when Harding refused to sign a written waiver of counsel form. Harding refused to sign it because the Judge insisted, over Harding's strenuous objection, on appointing advisory trial counsel. (Ex. 23 page 245) The Petition alleges that Cooper then gave misadvice as follows: "Petitioner was told by Cooper that Judge Gin would relieve Cooper as counsel only if petitioner 'threatened' him. Petitioner told Cooper to consider himself 'threatened'." Cooper then informed the court that he had ethical grounds for withdrawing. (Ex. 21 at page 20). Harding acknowledges that he instructed Cooper to consider himself threatened but that he was only doing what Cooper told him to do. (Ex. 34 page 50).

The presiding judge, Judge Druke, conducted a hearing with defense counsel, in chambers and off the record, to determine if there was an ethical basis for withdrawal. He reported to the trial court, Judge Gin, that "Mr. Harding has conveyed to counsel his intention to commit a crime. Correct me if I am wrong, Mr. Cooper. Mr. Harding has been advised that you [Cooper] have an ethical obligation to reveal that intention; and secondly, upon so

advising him he indicated he would not waive any potential conflict that may [sic] pose in your continued representation of him ... ." (Ex. 25 page 25). The trial Judge then allowed Harding to conduct his own defense. (Ex. 25 page 50). Cooper continued to represent the defendant on some pre-trial motions and as advisory counsel during the trial which began five days later.

A Rule 32 hearing was granted to consider the limited issue of whether Dan Cooper had rendered ineffective assistance of counsel based on the allegation outlined above. Eight witnesses testified at the evidentiary hearing on August 7 and October 30, 1984. Judge Gin denied relief and issued a detailed Minute Entry with Findings of Facts and Conclusions. The relevant findings of fact of the trial court are as follows: (Ex. 33 page 360 and Ex 9).

"1. Very early in the case Mr. Cooper realized that there was no possible factual defense and so informed Harding.

7. Well before trial, Cooper discussed with Harding that the best tactic was to delay in the hope that some appellate court would declare the death penalty unconstitutional.

8. Cooper explained to Harding that he would be convicted, that there was no defense on the facts, and that an insanity defense would fail.

9. Cooper discussed with Harding the kinds of error necessary to win reversal of the certain conviction. He explained that a reviewing court would have to find fundamental constitutional error.

12. Cooper explained to Harding that he had a Sixth Amendment right to represent himself and that, if he did, he might create reversible error. Cooper told Harding he would be convicted whether he represented himself or Cooper defended him.

13. March 15, 1982, Harding asked this Court to allow him to represent himself on a charge of deadly assault by a prisoner. At that time he told this Court that he had a GED high school equivalent, that he knew the ropes of the crimi-

nal justice system, that he had been tried on other charges, and that he demanded an immediate trial in that matter. The Court allowed Harding to represent himself in that other case.

14. March 23, 1982, Mr. Cooper asked to withdraw from the instant case because Harding had told him he did not want representation, not even advisory counsel. On the record Cooper informed the Court that he would do nothing further in the case because Harding had told him to do nothing more. Mr. Harding refused to sign a waiver of counsel at that time if the Court kept Mr. Cooper as advisory counsel, so the Court declined to allow Harding to represent himself.

15. Mr. Harding sent Mr. Cooper a letter dated April 6, 1982, now part of the record in this case. In that letter, Harding admitted Cooper's "diligent efforts" on his behalf, conceded he had a "very shabby defense," and stated that Cooper had done everything conceivable to build a defense. The letter also clearly indicates Harding's awareness that he would be convicted no matter who defended him, i.e. his statement: "and in knowing that either way its [sic] futile.". (Ex 7).

16. April 15, 1982, Harding renewed his demand to represent himself, without advisory counsel, and to proceed immediately to trial. Just prior to the hearing, Mr. Cooper filed a motion to withdraw for ethical reasons. It was subsequently revealed that Harding had threatened Mr. Cooper, the Court, and Mr. Wild. Cooper appeared to the Court to take these threats seriously. Harding stated on the record that he had told Cooper not to do any more interviews or arrange any tests and that he did not wish to interview witnesses. The Court permitted Harding to represent himself from that point forward, but kept Mr. Cooper as advisory counsel.

19. The Court rejects the contention that Harding had so little education that he did not realize what he was doing by

representing himself; he portrayed himself on the record to this Court as a high school graduate familiar with the trial who had been tried before a jury previously. That obviously was true because he was convicted in July 1981 of deadly assault by a prisoner, a conviction to which he stipulated at sentencing in this case, and has been in trouble with the law since the age of 11, as the presentence report thoroughly documents. The Court also notes especially the numerous occasions upon which Mr. Harding adamantly and repeatedly addressed this Court while asserting his constitutional right to self-representation and demanding a speedy trial. This boldness to speak belies the assertion that Harding represented himself because Mr. Cooper allegedly told him to do so. The Court further finds that Mr. Cooper did no more than explain to Harding his right to self-representation. Harding, fully cognizant that he would be convicted, made the choice to represent himself. His letter of April 6, 1982, to Mr. Cooper, makes it clear that Harding realized the futility of his case, had chosen to defend himself, and conceded that Mr. Cooper had done all he possibly could to build a defense.

## CONCLUSIONS

In light of the foregoing, the Court makes the following findings:

1. Representing himself was an act of desperation done by the defendant as a product of the collusion of the defendant and his attorney. (by Minute Entry, March 20, 1985 Judge Gin substituted the word 'collusion', at the request of the Defendant, for the word 'connivance' which was used in the original order). Defendant, because of his intelligence, experience with the criminal courts, and discussions with his attorney appreciated the risk of conviction if he represented himself and knowingly and intelligently assumed the risk. Defendant knew the probability of conviction even if an attorney represented him.

A written determination of a factual issue, after a hearing on the merits, by a court of competent jurisdiction, is presumed correct in a federal habeas corpus action. 28 U.S.C. 2254(d). The state court findings must be given the "highest measure of deference". *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). To overcome this presumption of correctness, a federal court must find one of the eight exceptions to 28 U.S.C.A. 2254(d), namely that the factual determination of the state court is not fairly supported by the record. 28 U.S.C. 2254(d)(8). If the record considered as a whole supports such a factual determination, the burden is on the habeas applicant to establish by convincing evidence that the factual determination by the state court was erroneous. 28 U.S.C.A. 2254(d).

The court has made an exhaustive and independent review of the entire state and appellate court records. The record unequivocally supports the findings made by Judge Gin. Harding has failed to convince this court that he was simply a pawn in Mr. Cooper's plans. Judge Gin made a specific finding that Harding "because of his intelligence, experience with the criminal courts, and discussions with his attorney appreciated the risk of conviction if he represented himself and knowingly and intelligently assumed the risk." (Ex. 9 Conclusion 1). The trial court found that Mr. Cooper did no more than explain to Harding his right to self-representation. Harding fully cognizant that he would be convicted, made the choice to represent himself. (Ex. 9 Finding No. 19). The findings made by Judge Gin necessitated that he weigh the credibility of the witnesses. Judge Gin dealt with these same people for a two year period prior to trial, during trial and at the Rule 32 hearing. "28 U.S.C. 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983).

"Face to face with living witnesses the original trier of fact hold a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth ... How can we say the judge is wrong? We never saw the witnesses.... To the sophistication and sagacity of the trial judge the law confides the duty of appraisal." *Id.,* at 851 quoting *United States v. Oregon Medical Society,* 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

This rationale was specifically adopted by the Ninth Circuit in a habeas corpus case dealing with the imposition of the death penalty. *Adamson v. Ricketts,* 758 F.2d 441, 447 (9th Cir.1985) rehearing granted 764 F.2d 1343 (9th Cir.1985). Further, no specific finding as to credibility needs to be made by the trial court. *Marshall,* 103 S.Ct. at 850. The court will not impose its opinion for that of the trial court. The factual findings made by Judge Gin are fully supported by the record and will stand.

■ The Petitioner's claim of ineffective assistance is, on its face, compelling. No court will condone advice by counsel which makes a charade out of the trial process. Advice to a defendant that he should represent himself could, in some instances, be considered per se ineffective assistance of counsel. For example, where there is a factual or legal defense, or the defendant does not understand the attorney's advice. In such instances advice to proceed pro se would constitute grounds for habeas corpus relief. See *Martin v. Rose,* 744 F.2d 1245 (6th Cir.1984). Sixth Amendment rights constitute some of the most protected and precious rights available in our criminal justice system. These rights are available to insure an accused receives a fair trial; not to guarantee a reversal.

Harding relies heavily on *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), as the legal basis for his claim of ineffective assistance. In *Cronic,* the Supreme Court held that some errors by counsel are so egregious that prejudice may be presumed.

"The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic,* 104 S.Ct. at 2047.

The Court noted that it "has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* 104 S.Ct. 2047 n. 25. No similar situation exists in this case.

■ Harding claims that the advice that Cooper gave him was so incompetent, based on a combination of factors, that it resulted in a denial of a fair and adversarial trial was required by the Supreme Court in *Chronic.* The factors Harding raises are three fold. One, the petition contends that Cooper gave up on Harding because the case was lost regardless of what anyone did as defense counsel. "Cooper offered the 'sacrifice of an unarmed prisoner to the gladiators', hoping that Petitioner would do such a poor job of defending himself that it would be deemed 'fundamental error'." (Amended Petition for Writ of Habeas Corpus page 15). The record does not support this argument. Cooper explored the available options under the facts and the law. He filed no less than 30 motions over the two year period the case was pending trial. He attempted to have evidence and incriminating statements suppressed but no legal basis existed to exclude the evidence. He sent an investigator to Arkansas to explore a theory that Harding had some type of organic brain disease. He sent Harding to mental examinations. No legal theory of insanity existed. Cooper assisted and adequately represented Harding at every stage of the pro-

ceedings until Harding elected to represent himself.

■ Harding claims, as his second factor, that Cooper's objections to the death penalty divided his loyalties between his client and himself. The court finds that Cooper's opposition to the death penalty did not, in any way, raise a conflict of interest as contemplated by the Supreme Court in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). On the contrary, Cooper's advice was given in an attempt to keep Mr. Harding from the imposition of the death penalty and this is one of the prayers for relief sought in this petition. If Harding truly disagreed with Cooper's opposition to the death penalty it appears this petition would not be before the court.

■ The third factor raised by Harding is that he suffered prejudice because of Cooper's ineffective advice and was denied a fair trial under the standard of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) due to the admission of certain photographs. Harding attempts to bolster his argument of ineffective assistance of counsel by arguing that prejudice resulted at trial and that the trial lost its adversary nature. Cooper's involvement, and any claim of ineffective assistance ended when Harding was allowed to proceed pro se. A defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to the denial of "effective assistance of counsel." *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975).

## B. FAILURE TO MAKE A KNOWING WAIVER OF COUNSEL

Petitioner claims that the trial court failed to properly determine whether Harding made a knowing and intelligent waiver of counsel. Harding alleges that Judge Gin failed to discharge his duty to make an appropriate inquiry as to whether Harding made an intelligent and competent waiver of counsel.

■ In *Faretta v. California* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) the Supreme Court specifically held that the Sixth Amendment implies a right of self-representation. The Court held; "when an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." *Id.* at 835, 95 S.Ct. at 2541 citing *Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The defendant must "voluntarily exercise his own informed free will." *Faretta* at 422 U.S. at 836, 95 S.Ct. at 2541. The question of why a defendant chooses to represent himself is immaterial. The Ninth Circuit stated in *Dujanovic,* "the reasons for one charged with a crime to waive the assistance of competent counsel in any given case range from the misguided or naive who just wants to tell the jury the truth, through the pressured one under the hardships of the accusation of crime and the sophisticated person enamored with his own ability, to the crafty courtroom experienced one who ruthlessly plays for the breaks. All eventually play the fool." *U.S. v. Dujanovic,* 486 F.2d 182, 186 (9th Cir.1973). The important question facing the court by Harding's refusal to accept counsel is whether he knew what he was doing and his choice was "made with open eyes." *Id.* at 187.

■ The petition correctly asserts that the trial judge has the duty of determining whether there is an intelligent and competent waiver by the accused. "To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand.... *Von Moltke v. Gillies,* 332 U.S. 708, 723, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948). It is important therefore to consider the entire record and surrounding circumstances to determine whether Harding's waiver of the right to counsel was

knowingly and intelligently made. A reviewing court has the task to determine from the record whether the accused understood the risks when he elected to represent himself. *U.S. v. Kimmel*, 672 F.2d 720 (9th Cir.1982).

■ The record reflects that while awaiting trial on the murder charges, which underlie this petition, Harding was charged with dangerous assault by a prisoner. Cooper filed a motion to withdraw because Harding requested that he be allowed to represent himself. March 15, 1982 Judge Gin conducted a hearing and granted the motion. The Judge questioned Harding as follows: (Ex. 24 pages 225–141)

THE COURT: Mr. Harding, is that correct, you want to represent yourself in this case?

MR. HARDING: Yes, I do

THE COURT: Let me ask you, Mr. Harding, how much education have you had?

MR. HARDING: GED, high school equivalent.

THE COURT: And do you—let's see, have you been tried before on any kind of charge, any kind at all?

MR. HARDING: Yes.

THE COURT: So you think—do you know the ropes legally pretty much as to what the procedures are and that sort of thing?

MR. HARDING: I think so.

THE COURT: Are you unhappy with the Mr. Cooper's representation or what?

MR. HARDING: I am unhappy with the way—that the charge is being processed. This is about eight months old. I never waived speedy trial on it and to my knowledge the prosecution—it has been in suspended animation for eight months now and I don't see any point in that. I would like to enter an oral motion for immediate trial on that.

. . . .

THE COURT: Well, you know Mr. Harding, perhaps you—maybe you don't appreciate the fact that delay often works in your favor.

. . . .

THE COURT: You realize, Mr. Harding, that, you know, you are going to be carrying the ball then hereafter. I am not going to stop the middle of the trial and you say: Hey, let's put Cooper on the firing line here now. You know you are it.

MR. HARDING: I understand that. I—

. . . .

THE COURT: Do you realize, sir, that if the State proves that these were offenses of a dangerous nature and you were previously convicted of a felony that this prison term is mandatory?

MR. HARDING: Twenty-five to life.

THE COURT: You understand that?

MR. HARDING: Yes.

THE COURT: And you are still willing—you are still willing to represent yourself?

MR. HARDING: Absolutely.

March 23, 1982, Cooper made a motion to withdraw as Harding's counsel on the murder charges of Wise and Concannon. The following inquiry was made by Judge Gin on this occasion: (Ex. 24 pages 245–254).

MR. COOPER: Your Honor, this is my application to withdraw on 2597. You granted the motion on the other CR number ten days or so ago. Mr. Harding informed me after that hearing ten days ago that on the murder case he desire to represent himself as well and does not want the services of an attorney, and particularly of me or of our office.

THE COURT: Is that correct, Mr. Harding?

MR. HARDING: Yes.

THE COURT: Mr. Harding, you know you are charged in 2597 with first degree murder. That could result in the death sentence. I just remind you of this because it is a terribly serious terribly complex case. Are you quite certain you want to represent yourself in a matter like that?

MR. HARDING: Absolutely.

THE COURT: Let's see, I did ask you some questions last time about your education. I believe you told me—.

MR. HARDING: High school equivalent.

THE COURT: High school equivalent. And you indicated you thought you had a pretty good familiarity with criminal procedure and rules. Do you want Mr. Cooper to be your advisory counsel in this thing?

MR. HARDING: No, I wouldn't care to have an advisor.

. . . .

Harding refused to sign the waiver of counsel form because the Judge appointed Mr. Cooper as advisory counsel. Judge Gin then denied the motion to withdraw.

April 15, 1982 Mr. Cooper renewed his motion to withdraw as Harding's counsel (Ex. 24 page 20) based on ethical considerations. The presiding judge conducted an in chambers, off-the-record, hearing with defense counsel. He concluded that Harding had conveyed to counsel his attention to commit a crime and had refused to waive any potential conflict that might arise during Cooper's continued representation.

A discussion ensued, in open court, concerning Harding's desire to represent himself and whether or not Harding would have to accept advisory counsel. After Harding acknowledged that he was willing to waive counsel, the trial judge ruled that he would permit Harding to represent himself but would appoint Cooper as advisory counsel. The court stated: "I am persuaded that no matter who represents or who is appointed as advisory counsel is going to have the problem of threats." (Ex. 25 page 50).

The Ninth Circuit has consistently held that in order to make a knowing and intelligent waiver of the right to counsel a defendant must be aware of the nature of the charges and possible penalties, as well as the dangers and disadvantages of self-representation in a complex area where experience and professional training are valuable. *U.S. v. Rylander,* 714 F.2d 996, 1005 (9th Cir.1983). *U.S. v. Harris,* 683 F.2d 322

(9th Cir.1982). *U.S. v. Dujanovic,* 486 F.2d 182 (9th Cir.1973), *U.S. v. Gillings,* 568 F.2d 1307 (9th Cir.1978).

This procedure is clearly preferable and should be followed but failure to do so will not in every case necessitate reversal. *U.S. v. Harris,* 683 F.2d 322 (9th Cir.1982), *Cooley v. U.S.,* 501 F.2d 1249 (9th Cir. 1974). This Circuit has not adopted a "per se" rule which requires reversal of a conviction if the Court fails to formally advise the defendant on the record of the risks of self-representation. *Kimmel* 672 F.2d 720, 723 n. 1 (9th Cir.1982).

The Ninth Circuit reiterated in *Harris* that there is a narrow path to be carefully tread between the *Faretta* right to refuse counsel and the assurance of *Dujanovic* that refusal of counsel's services is done with full awareness of the risks of doing so. They stressed that only in rare cases will an adequate waiver be found on the record in the absence of a specific inquiry by the trial judge. *Harris,* 683 F.2d at 324 citing *U.S. v. Aponte,* 591 F.2d 1247, 1249 (9th Cir.1978).

The facts presented in this case are highly unique and hopefully very rare. Harding after a two year pre-trial period, on the eve of trial, attempted to create some type of Sixth Amendment error. The record clearly establishes that counsel had informed the defendant of the perils of self-representation. In *Harris* the Court noted that advisory counsel had been appointed and that it was possible that advisory counsel had advised the defendant of the risks of acting as his own attorney. *Harris,* 683 F.2d at 325.

Harding had appointed counsel actively acting on his behalf until shortly before trial. Within three months of his assignment to Harding's case Cooper began discussing with him the possibility of representing himself. (Ex. 6 page 23). They discussed the problems and options available, these included the possibility of an insanity defense, the lack of a factual defense and the chances of receiving the death penalty. (Ex. 6 page 26). Cooper

also explained to Harding the concept of fundamental error and the chance of appellate reversal through the right to counsel. (Ex. 6 page 27–28). Cooper told him that, in his opinion, even the best lawyer could not win the case on a factual or legal defense. Cooper told Harding that he should stay on as counsel during pre-trial because of the resources available to him as a public defender.

This court is convinced that Harding knew the risks of self-representation and in fact was attempting to capitalize on such risks in order to create reversible error. See *U.S. v. Romero,* 640 F.2d 1014 (9th Cir.1981) in which a tax protestor had appointed counsel for two months and then demanded to proceed pro se. The court held that Romero, by his own deliberate and intentional actions, sought to insert built-in error in the proceedings and, despite his contention of unknowing waiver of counsel, had received a fair trial. "Courts are established at public expense to try issues, not to play games." *Id.* at 1016. The trial judge found that Harding, "because of his intelligence, experience with the criminal courts, and discussions with his attorney appreciated the risks of conviction if he represented himself and knowingly and intelligently assumed such risk. Defendant also knew the risks of conviction if an attorney represented him." (Ex. 9).

It is interesting to note that the Arizona Supreme Court found that the state record "complies with the federal and state standards requiring a knowing and intelligent waiver of the right to counsel and assertion of his right to self representation." *State v. Harding,* 137 Ariz. 278, 670 P.2d 383, 391 (1983)

The court finds that Donald Harding was informed by the trial judge of the charges and possible penalties against him. The court finds that he was informed by his attorney of the options available to him and was aware of the risks involved in self-representation. Although Judge Gin failed to make a perfect waiver inquiry, the record made falls within the standards of *Farret-*

*ta* and *Dujanovic.* The evidence against Mr. Harding is overwhelming. Questions or admonishments from the Judge would not have changed Mr. Harding's mind about proceeding pro se but more importantly would have had no effect on the trial or its outcome.

Harding's claim that the trial judge failed to properly determine whether he made a knowing and intelligent waiver of counsel is dismissed.

## C. COMPETENCY HEARING

Petitioner claims his right to due process of law was violated by the trial court's failure to conduct a proper inquiry or hearing to determine petitioner's competency to waive his right to counsel.

Harding contends that the trial judge had doubt as to Harding's competency and therefore should have, sua sponte, held a hearing to determine whether he had the mental capacity to waive his right to counsel. Harding claims the Judge's failure to make adequate inquiry into his competency to waive counsel denied him due process and a fair trial. This court disagrees. Harding relies on the District Court opinion in *Evans v. Raines,* 534 F.Supp. 791 (Ariz. 1982) in which the court applied the following standard in examining competency to waive counsel:

"Due process requires a trial court to hold a hearing, sua sponte, on a defendant's competency to waive counsel whenever the trial judge entertains or reasonably should entertain a good faith doubt as to the defendant's ability to 1) understand the nature and consequences of the waiver; 2) participate intelligently in the proceedings; or 3) make a reasoned choice among the alternatives presented." *Id.* at 794–795.

The court held in *Evans* that there was substantial evidence before the trial judge of Evan's inability to make a reasoned choice among the alternatives of having counsel or representing himself. The evidence of incompetency in that case included a long history of mental illness and a reluctance on Evan's part to reaffirm his waiver

of counsel at the time of trial. Also, in *Evans,* advisory counsel complained of Evan's incompetency during trial and informed the court at sentencing that the paranoid system under which Evans operated had expanded to include his counsel's public defender office.

The Ninth Circuit affirmed the district court's finding that substantial evidence of incompetency was presented to the trial court. They remanded the case to the district court with directions to send it back to state court for further proceedings to determine whether Evan's competently and intelligently asserted his right to self-representation.

As explained in *Evans,* the Ninth Circuit cases have consistently held that a good faith doubt arises in the trial court if there is substantial evidence of incompetency before the court. "Evidence of incompetence may include, but is not limited to, the existence of a history of irrational behavior, medical opinion, and the defendant's demeanor at trial. (cites omitted) In other words, at any time there appears from any source, substantial evidence of the defendant's incompetence there is a good faith doubt that cannot be dispelled by resort to conflicting evidence and the trial court sua sponte must order an evidentiary hearing on the competency issue." *Id.* at 795.

▮ This court's review of the state court's failure to provide a competency hearing must be comprehensive because the issue involves a mixed question of fact and law and therefore is not governed by § 2254's presumption of correctness. However, questions of facts which underlie the ultimate legal conclusions of competency by the state court must be awarded the statutory presumption of correctness. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). *Evans,* 534 F.Supp. at 795 n. 5.

▮ The record reveals that the issue of Harding's competency was first presented to the trial court on September 9, 1980 when Harding's attorney filed a Rule 11 Motion to have Harding examined to determine if he was able to understand the

proceedings or assist in his defense and to investigate his mental condition at the time of the offense. (Ex. 16 page 235).

The trial court conducted a hearing on September 22, 1980, on the defendant's request for a Rule 11 examination. Defense counsel informed the Judge that Harding suffered from an organic non-regenerative brain disease and epileptic seizures. Counsel told the court that documentation of this claim was in Arkansas where three EKG's, the last in 1968, had been performed on Harding. Defense counsel assured the court that Harding was able to understand the proceedings and there was no indication of incompetency but they wanted psychiatric examinations to determine his state of mind at the time of the murders. The Judge granted the Rule 11 Motion. (Ex. 10 page 118–19).

Subsequently, the court appointed psychiatrist David Gurland and John LaWall to examine Mr. Harding and report to the court. (Ex. 16 page 28). Harding was uncooperative with the psychiatrists. March 5, 1981 Harding filed a motion to withdraw his Rule 11 which was denied. (Ex. 17 page 411). Counsel stipulated that a determination of Harding's competency be submitted to the court based upon psychiatric reports. (Ex. 17 page 423). The court found the defendant was competent to stand trial because he was able to understand the proceedings against him and assist counsel in his own defense. (Ex. 17 page 424). The Supreme Court held the trial court did not abuse its discretion in determining that Harding was mentally competent to waive counsel and characterized the March 23 hearing as one to determine if Harding was competent to waive counsel. *Harding,* 670 P.2d at 391.

March 23, 1982 the trial court conducted a hearing to determine whether Harding should be allowed to represent himself on the murder charges. Harding unequivocally stated that he wanted to represent himself and that he did not desire to have advisory counsel. It is quite clear from the record that Harding understood the pro-

ceedings which supports the trial court's original ruling that Harding was able to represent himself. (Ex. 24 page 244–254).

No additional evidence of incompetency is demonstrated or suggested in the record by Harding's behavior prior to or during trial. Harding's demeanor at trial was responsive and rational. In fact he objected whenever the court, or the prosecutor, addressed their remarks to advisory counsel instead of to him. The Judge made findings of fact after the Rule 32 post-conviction proceeding which reflect on Harding's demeanor during trial. He noted that a letter written by Harding to his attorney indicates "Donald Harding possesses far more than a fourth-grade mentality, that he is capable of expressing himself forcefully and effectively when he chooses, and that he knew exactly what he was doing when he waived his right to counsel." (Ex. 9 page 8). This finding demonstrates the Judge's belief that Harding was competent to assert his right to self-representation.

After a thorough review of the state court record, this court finds that no substantial evidence of incompetence was presented to the trial judge which should have given rise to a good faith doubt as to Harding's competency. Therefore, the Judge's failure to hold a sua sponte competency hearing prior to Harding's waiver of counsel did not violate Harding's constitutional right to due process.

## D. ADMISSION OF PREJUDICIAL PHOTOGRAPHS

Petitioner claims his right to a fair and impartial trial, as guaranteed by the Sixth and Fourteenth Amendments was violated by admission of certain photographs.

Harding asserts alternative theories in support of this claim. First, that the trial court did not accept Harding's waiver of his advisory counsel's objection to the photographs, because the trial court continued to make an individual determination as to the admissibility of each photo no. 22 through no. 107. Second, that the Arizona Supreme Court committed error in not reversing his conviction based on admission of these prejudicial photographs.

As to the invalid waiver theory, during pre-trial motions advisory counsel made a standing objection to the admission of photographs depicting the crime scene and the autopsies performed on the victims. (Ex. 27 page 50). The court had examined approximately 24 pictures when Harding moved to admit all the pictures. (Ex. 27 page 66). The prosecutor refused to accept the offer of stipulation and the Judge proceeded to examine each photograph as it was offered into evidence. Further, when the photos were individually offered into evidence at trial Harding was asked each time if he had any objection to admission. He responded almost exclusively "no objection". (Exs. 28 & 29).

Harding's argument that the Supreme Court incorrectly found a waiver is rejected. The Court stated: "Because the waiver of objection at trial made by the defendant is valid, he may not raise the issue on appeal. *State v. Harding*, 137 Ariz. 278, 670 P.2d 383, 396 (1983). Failure to object to the admission of evidence at trial constitutes procedural default. A state prisoner, barred by a procedural default from raising a constitutional claim on direct appeal in the state courts, cannot litigate that claim in a federal habeas corpus proceeding without showing cause for the default and actual prejudice from the constitutional errors alleged in the petition. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

Harding does not allege any grounds as cause for his failure to object to the admission of the photographs. The burden of showing cause is on the petitioner. *Sykes*, 433 U.S. at 91, 97 S.Ct. at 2508. Harding specifically maintained no objection to the photos. After a review of the record, the court finds that no cause for the default exists. Because Harding has failed to meet his burden of showing cause, the court need not address the prejudice

prong of the *Sykes* test. *Garrison v. McCarthy,* 653 F.2d 374, 379 (9th Cir.1981).

Harding's alternative theory is that the Arizona Supreme Court's failure to find that the admission of the gruesome photographs was fundamental error violated Harding's right to due process and a fair trial. To support his theory, Harding must show that admission of the photographs, even if erroneous, rendered the trial so arbitrary and fundamentally unfair as to violate federal due process. *Butcher v. Marquez,* 758 F.2d 373, 378 (9th Cir. 1985); *Pennywell v. Rushen,* 705 F.2d 355, 357–358 (9th Cir.1983).

Harding relies on the following comments by Arizona Supreme Court's to show that admission of the photographs was so prejudicial as to render the trial unfair:

"We have no hesitancy in stating that had the defendant maintained a valid objection, we would consider reversing the conviction, because the prejudice of several gruesome photographs among the over 90 admitted outweigh their probative value. We believe that counsel, by 'overtrying' his case, could well have placed the conviction in jeopardy." *State v. Harding,* 137 Ariz. 278, 670 P.2d 383, 396 (1983).

The court will assume that several of the photos were improperly admitted into evidence. However, the fact the photos should not have been admitted does not necessarily mean Harding was denied his constitutional right to a fair trial. To determine if this admission amounted to constitutional error[1] "the question a reviewing court must ask is this: absent the ... error, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *Adamson v. Ricketts,* 758 F.2d 441, 446 (9th Cir.1985) citing *United States v. Hasting,* 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). The evidence presented at trial appears in detail on pages 1–6 of this order. Had the jury seen only a portion of the 93 pictures, the following evidence would have been before the jury:

1) The bodies of Robert Wise and Martin Concannon were found bound and beaten at a motel in Tucson on January 26, 1980.

2) Harding's prints were found on at least seven items in that hotel room.

3) Robert Svetgoff testified that he had been bound, gagged and robbed by Donald Harding in a motel on December 18, 1979.

4) Jeri Wise testified that Harding, a stranger, came to her home, January 25, 1980, and asked to see her husband.

5) Harding was arrested in Flagstaff on January 26, 1980 driving Martin Concannon's car. He had a gun on his person which was identified as the weapon used in the Tucson murders. He also had an identification card issued to Robert Svetgoff.

6) The car Harding was driving was searched. It contained Robert Wise's attache case and his credit cards.

7) A chemist testified that human blood was found on a shirt which had been turned over by Flagstaff jail personnel and identified as worn by Harding.

8) The pathologist's testimony of the wounds, accompanied by some photographs, of the wounds inflected upon the victims.

9) Harding's jacket pocket contained the torn out page of an address book with the name Concannon circled.

10) Two incriminating statements made by Harding were introduced into evidence.

Harding also argues, in support of his allegation that the Arizona Supreme Court committed error, that the Court's reversal of the conviction in *State v. Steele,* 120 Ariz. 462, 586 P.2d 1274 (1978) indicates that they committed error by not reversing

---

1. Although the Arizona Supreme Court dismissed this claim for procedural default, they also searched the record for fundamental error, pursuant to A.R.S. § 13–4035, and found none. *State v. Harding,* 137 Ariz. 278, 670 P.2d 383, 401 (1983).

in Harding's case. In *Steele* the court held that the victims' bloody shirt, which was admitted over objection, would arouse and inflame the emotions of the jury. The court found the shirt added nothing to the evidence in front of the jury and was intended only to arouse and inflame the emotions of the jury. The factual situation in *Steele* is inapposite to this case. Conflicting evidence was offered in *Steele* concerning the death of the victim and the defendant offered a theory of self-defense. No such exculpatory testimony was given at Harding's trial. More importantly, the Court found that the bloody shirt was introduced only to prejudice the jury. The pictures introduced in Harding's case, although gruesome, had some probative value as they were illustrative of the testimony given by the detectives and the pathologist. The fact the Court reversed in *Steele* does not prove they committed error by failing to reverse Harding's conviction.

The court finds that Harding's constitutional rights were not violated by the introduction of the prejudicial photographs and that he received a fair and full trial.

### E. RECUSAL OF THE PROSECUTOR

Petitioner claims the trial court denied him his right to compulsory process and cross examination when the court failed to recuse the prosecutor. Harding alleges that the prosecutor, Victor Wild, was present during most of the questioning done after Harding's arrest and that he had opportunity to observe Harding's demeanor and emotional state of mind. Harding claims because the voluntariness and state of mind were key issues that Wild's testimony was necessary to a fair trial.

Harding's attorney filed a Motion to Recuse the Prosecutor on May 12, 1980. (Ex. 16 page 163). July 9, 1980 the trial court conducted a hearing on that motion. (Ex. 6 page 201). July 17, 1980 the court denied the motion stating; "It would appear that the participation of the Deputy County Attorney to anything of consequence to the Defendant is either minimal or nonexistent. In addition, there are other witnesses who could be questioned regarding anything which is of materiality in which the County Attorney may have had any participation." (Ex. 16 page 203).

The Arizona Supreme Court considered Harding's claim that he was denied compulsory attendance of a witness and cross examination. They held, "the defendant did not show a need for calling the prosecutor as a witness at trial, and the prosecutor's recusal from the case was not required." *State v. Harding*, 137 Ariz. 278, 670 P.2d 383, 390 (1983).

These factual findings by the state courts must be afforded a presumption of correctness unless found to be unsupported by trial record as a whole. 28 U.S.C. § 2254(d)–2254(d)(8). *Summer v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). The record reveals the following testimony which supports the conclusions, drawn by the state courts, that the motion to recuse the prosecutor was properly denied and that Harding's constitutional rights were not violated.

Detective Steve Bunting, testified at a suppression hearing April 16, 1982, that he was the only one with Harding when he made an incriminating statement at the airport. (Ex. 26 page 72). Bunting testified that he was in the room when the prosecutor questioned Harding and that the prosecutor was there for, at the most, 5 minutes. He also stated that there were always two detectives with Harding and that both were present when the prosecutor spoke to Harding. (Ex. 26 page 99–102).

Detective Peter O'Crotty, testified April 20, 1982, at a continuation of the same suppression hearing, that he assisted in transporting Harding to Tucson and was present at all times when Harding was questioned. O'Crotty could not recall when the prosecutor was in the room and testified that one or more detectives would have been in the room when the prosecutor spoke to Harding. (Ex. 27 page 8–11).

At the April 20 hearing, advisory counsel renewed his motion to call the prosecutor

as a witness. The court again denied the motion. (Ex. 27 page 18–19). The prosecutor then made an offer of proof of what his testimony would show. He stated that he was never alone with Harding and he did not overhear the conversations Harding had with the detectives. (Ex. 27 page 19–24). Wild stated there was no indication of emotion by Harding while he was being transported from Flagstaff and that he did not seem hysterical or extremely upset in the investigation room. (Ex. 27 page 22–24).

This testimony combined fully supports the conclusion that the prosecutor's participation was minimal and his testimony would, at best, have been cumulative on any possible material point.

 In order to show a deprivation of his Sixth Amendment right to confrontation, Harding must demonstrate that the evidence a witness can offer is material. Evidence is material only if there is a reasonable probability that, had the evidence been presented to the jury, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the case. *United States v. Bagley,* — U.S. —, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Harding had failed to demonstrate that the prosecutor's testimony would have changed the outcome of the trial. Therefore, Harding's claim that his constitutional rights were violated by the trial court's failure to recuse the prosecutor is without merit.

## F. SUPPRESSION OF STATEMENTS

Petitioner claims his Fifth Amendment right against self-incrimination made applicable by the Fourteenth Amendment was violated when the trial court denied the pre trial motion to suppress Petitioner's statements.

Harding made several incriminating statements, two of which were allowed into evidence. The first was made at the Flagstaff airport when Harding was being transported back to Tucson. Detective Steve Bunting testified at the suppression hearing that when he attempted to shield Harding from the airport's cold wind Harding said, "You don't need to do that, I deserve whatever I get." (Ex. 26 page 72–73). The detective stated that he did not ask Harding any questions to prompt this statement.

The second statement was made at the Pima County Jail prior to a routine strip search during the booking procedure. Detective Bunting again testified that Harding asked if he could keep some of his clothes or get some of his clothing back. Bunting told him that the clothing was evidence and would have to go to the lab. Bunting testified that Harding responded the only thing the police might find something on would be the burgundy shirt and the shoes he was wearing when he was arrested. (Ex. 26 page 79).

Harding contends that he had asserted his right to cut-off questioning and this was totally disregarded by the police in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Harding alleges that these statements were not made as a result of a knowing and intelligent waiver of his constitutional rights; but rather, Harding's statements were the product of the compelling atmosphere in which he was placed and therefore admission of the statements was reversible error.

The trial court held a suppression hearing and denied the motion to suppress without making specific findings of fact. (Ex. 18 page 481; Ex. 27 page 31). The Arizona Supreme Court upheld the trial court's decision to allow the statements into evidence. The court held that neither statement was given in response to any interrogation of the defendant by the detective, or any attempt by the police not to scrupulously honor the defendant's right to remain silent. The Supreme Court concluded the statements were made as a result of a conversation initiated by the defendant, and are admissible into evidence at trial against him. *Harding,* 670 P.2d at 393.

The conclusions of fact by the court that the statements were not made as a result of interrogation and were initiated by Harding are entitled to a presumption of correctness. Harding has the burden to establish otherwise unless the record as a whole fails to support these factual conclusions. 28 U.S.C. § 2254(d) and § 2254(d)(8).

The court finds, after a thorough review, that these conclusions are fully supported by the trial record as the testimony outlined above demonstrates. Harding fails to offer any evidence to the contrary. A defendant is not placed in a coercive or compelling atmosphere simply because he is arrested and taken into custody. A statement voluntarily made by a defendant of his own free will, without coercion or interrogation by police, is admissible at trial. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Harding's fifth amendment rights were not violated by the trial court's denial of the motion to suppress. Therefore, this sixth and final claim is without merit.

## IV.

## CONCLUSION

None of the claims raised by Donald Eugene Harding entitle him to any type of habeas relief. This court has reviewed all the claims raised in this petition, and has made an exhaustive review of the entire state record, and finds them to be without merit. Therefore, Harding is denied any relief by this action.

Harding has requested the court to conduct a hearing at which proof may be offered concerning the allegations of this petition. He has also requested the court to grant sufficient funds to secure expert testimony, witnesses and documents in order to prove facts alleged in this petition. An evidentiary hearing is required in the district court if a petitioner has alleged facts which, if proven, would entitle him to relief. No such hearing is required if the merits of petitioner's claim were resolved in state court. *Pierce v. Cardwell,* 572 F.2d 1339, 1341 (9th Cir.1978). Harding has been afforded a hearing in state court on every issue raised in this petition and has failed to specify a specific area in which he believes additional proof is necessary. The court finds that the state court record is complete on each claim raised.

IT IS ORDERED that the request for a hearing is denied.

IT IS ORDERED that the request for funds to secure experts, witnesses and documents is denied.

IT IS ORDERED that the petition for writ of habeas corpus in this action is denied.

IT IS ORDERED that this action is dismissed.

IT IS ORDERED that no certificate of probable cause shall issue in this matter.

IT IS FURTHER ORDERED that the stay of execution imposed by this court on August 2, 1985 is vacated.